In re **MANVILLE FOREST PRODUCTS CORPORATION, Debtor.**

**Bankruptcy No. 82 B 11659.**

United States Bankruptcy Court, S.D. New York.

Oct. 5, 1984.

11. 16 Cal.L.Revision Comm'n Reports, 1000, 1098–99 (1982).

Davis Polk & Wardwell, and Levin, Weintraub & Crames, New York City, for Manville Forest Products Corp.; Stephen H. Case, Lowell Gordon Harriss, Peter C. Kornman, Rodman W. Benedict, New York City, of counsel.

White & Case, New York City, for committee of unsecured creditors of Manville Forest Products Corp.; Jeffrey Barist, Alan L. Gropper, William P. Hammer, Jr., New York City, of counsel.

Mayer, Brown & Platt, Chicago, Ill., for Continental Illinois Nat. Bank and Trust Co. of Chicago; Harold L. Kaplan, Chicago, Ill., of counsel.

## MEMORANDUM OPINION AND DETERMINATION OF ISSUES SUBMITTED UNDER PLAN OF REORGANIZATION

BURTON R. LIFLAND, Bankruptcy Judge.

On August 26, 1982, Manville Forest Products Corporation, the above-captioned debtor ("MFPC"), filed a petition for reorganization under Chapter 11 of the Bankruptcy Code ("the Code"). MFPC is a wholly owned subsidiary of the Manville Corporation. It is a manufacturer of timber, paper, and other wood products. It has never mined, manufactured or sold asbestos or any asbestos-containing product. Therefore, arguably it faces no liability for the asbestos claims asserted against Johns-Manville Corporation and the other Manville subsidiaries which also filed for Chapter 11 protection contemporaneously with MFPC. See *In re Manville Forest Products Corp.*, 31 B.R. 991, 992 (S.D.N.Y. 1983).

MFPC and certain of its institutional creditors have submitted the within dispute for determination by this Court. These institutional creditors consist of The Prudential Insurance Company of America, Aetna Life Insurance Company, the Travelers Insurance Company, Metropolitan Life Insurance Company, Mutual Life Insurance Company of New York, The First National Bank of Commerce, and Continental Illinois National Bank & Trust Company of Chicago, among others. In addition, Bankers Trust Company (secured) and several other individual creditors are long-term lenders in this proceeding. These creditors will be referred to collectively as the "long-term lenders". The essential facts are not in dispute.

## I. *Factual Background*

As of the date of the bankruptcy petition MFPC had long term debt outstanding under the terms of eight loan agreements and three issues of tax exempt bonds. MFPC was also a party to five identical assumption agreements with five insurance companies. Under the terms of each of these loan agreements (collectively, the "Loan Agreements"), the filing of a petition in bankruptcy constituted an event of default. Upon the occurrence of such event of default, each long-term lender had the option of accelerating the entire principal amount of its debt by notifying MFPC, in writing, of its intent to do so.[1] All but one of the

---

1. A typical example of an acceleration clause under the long-term lending agreements is contained in the trust indenture between MFPC and Continental Illinois National Bank & Trust Company of Chicago as Trustee:

 Upon the occurrence of an event of default Trustee may ... by notice in writing delivered to Issuer and Lessee, declare the principal of all Bonds then outstanding and the interest accrued thereon immediately due and payable, and such principal and interest shall thereupon become and be immediately due and payable.

lenders failed to notify MFPC of its default after the bankruptcy petition was filed.

In addition to the default occasioned by the Chapter 11 filing, MFPC also committed a second event of default under the lending agreements. Between August 26, 1982, the date the petition was filed, and April 5, 1984, MFPC failed to make installment payments of principal or interest on most of the long term loan agreements in question.[2]

On October 17, 1983 MFPC filed a plan of reorganization with the Bankruptcy Court ("the Plan"). In the Plan, MFPC deals with the long-term lenders by dividing them into three classes: Secured Lenders, Lenders Under Tax Exempt Bond Issues, and Unsecured Institutional Lenders. The Plan provides that the defaults under each of the loan agreements in question will be cured, the debts will be deaccelerated, and the long-term lenders will be compensated pursuant to Code Section 1124(2).[3] For purposes of resolving this dispute the long-term lenders do not seek a determination based upon the secured or unsecured status of their claims.

MFPC's Plan was confirmed by this Court on March 26, 1984. Although the Plan is consensual in most respects, the long-term lenders were unable to reach an agreement with MFPC on the extent of the cure necessary to leave the long-term lenders unimpaired, as that term is defined in Code Section 1124. Both MFPC and the long-term lenders agree that in order to be left unimpaired under the Code, each long-term lender must be compensated for "any damages incurred as a result of any reasonable reliance" on the acceleration clauses in question. However, the parties disagree as to the amount of compensation necessary to satisfy the requirements of the Code. The long-term lenders argue that "adequate compensation" under the terms of section 1124(2)(C) requires that they be granted interest on the entire accelerated amounts of the debts, as well as interest on the defaulted installment payments of principal and interest. MFPC, on the other hand, contends that the debt was never accelerated to begin with, because the long-term lenders failed to notify MFPC of their intent to accelerate as required under the terms of the loan agreements. Further, MFPC argues that even if the contracts were properly accelerated, the ability to deaccelerate and reinstate a defaulted contract under 1124(2) precludes the obligation to pay any post-default obligation. Finally, MFPC argues that the obligation to pay interest on interest which accrues post-petition is to be governed by state law, which in this case prohibits such payments.

Rather than delay consummation of a Plan, the parties have agreed to submit

---

**2.** MFPC did enter into stipulations with Bankers Trust Company and Continental Illinois National Bank & Trust Company of Chicago, as Trustee, which were approved by this Court on November 2, 1983 and March 8, 1983, respectively. Pursuant to these stipulations, MFPC has made payments of principal and interest on the "Unimpaired Obligations" to these two long term lenders.

On April 6, 1984, MFPC agreed to pay, and did pay interest, at the post-default interest rate provided in the various agreements, on all installments of principal which came due during the pendancy of the reorganization proceedings.

**3.** Section 1124 of the Code provides in pertinent part:

A class of claims or interests is impaired under a plan unless, with respect to each claim or interest of such class, the plan—

. . . . .

(2) notwithstanding any contractual provision or applicable law that entitles the holder of such claim or interest to demand or receive accelerated payment of such claim or interest after the occurrence of a default—

(A) cures any such default ... that occurred before or after the commencement of the case under this title;

(B) reinstates the maturity of such claim or interest as such maturity existed before such default

(C) compensates the holder of such claim or interest for any damages incurred as a result of any reasonable reliance by such holder on such contractual provision or such applicable law; and

(D) does not otherwise alter the legal, equitable, or contractual rights to which such claim or interest entitles the holder of such claim or interest....

these two unresolved issues of law to this court for determination.

The issues which the parties have put before this Court for determination are as follows:

1) whether MFPC is required to pay interest on the entire accelerated indebtedness under the long-term Loan Agreements;

2) whether MFPC is required to pay interest on the overdue interest payments, and if so, whether the appropriate rate of interest is the contract rate or the market rate.

MFPC has agreed with its creditors to pay the post-default interest rate on all principal installments which remained unpaid between August 26, 1982 and April 5, 1984. Therefore, the question of whether a debtor must cure defaults by paying the post-default interest rate to leave a creditor "unimpaired" under Section 1124 of the Bankruptcy Code is not before the Court.

## II. *Acceleration and Deacceleration of Debt under the Code*

The first issue which this Court must address is whether MFPC is required to pay interest on the entire accelerated indebtedness in order to leave the long-term lenders unimpaired under the provisions of Code Section 1124. In this context the Court will first determine whether, and in what circumstances, a debt which is unmatured as of the date of a bankruptcy filing will be deemed accelerated for the purposes of appropriate compensation to creditors in this reorganization plan.

### A. *Acceleration of Debt*

■ MFPC's first contention is that in order to accelerate the entire debt due under the loans, the long-term lenders were required to notify MFPC of their intent to accelerate the debt, as required by the terms of the various contracts. Their failure to do so, alleges MFPC, precludes the lenders from asserting their claims for interest on the accelerated debt. The long-term lenders, on the other hand, take the position that the debts due under the various long-term agreements in question were automatically accelerated at the time of the filing of the petition by operation of Section 502(a) of the Code,[4] irrespective of any contractual clause requiring notice.

This Court agrees with the long-term lenders that the debt due them was automatically accelerated by the filing of the bankruptcy petition. It is a basic tenet of the Bankruptcy Code that "[b]ankruptcy operates as the acceleration of the principal amount of all claims against the debtor." *In re Tonyan Construction Company, Inc.*, 28 B.R. 714, 727 (Bankr.N.D.Ill.1983); *In re Princess Baking Corporation*, 5 B.R. 587, 590 (Bankr.S.D.Ca.1980). *See also In re Johns-Manville Corp.*, 36 B.R. 727, 740 (Bankr.S.D.N.Y.1984), *Guarantee Trust Co. of New York v. Henwood*, 86 F.2d 347, 351 (8th Cir.1936). This tenet follows logically from the expansive Code definition of "claim", which allows any claim to be asserted against the debtor, regardless of whether such claim is "reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed [or] undisputed...." 11 U.S.C. 101(4)(A), and from the Code's provision in Section 502 that a claim will be allowed in bankruptcy regardless of its contingent or unmatured status. Such contingent or unmatured claims may be asserted against the debtor despite the provisions of

---

**4.** Code section 502 provides in pertinent part:
(a) A claim or interest, proof of which is filed under section 501 of this title, is deemed allowed, unless a party in interest ... objects.
(b) [I]f such objection to a claim is made, the court, after notice and a hearing, shall determine the amount of such claim as of the date of the filing of the petition, and shall allow such claim in such amount, except to the extent that—

(1) such claim is unenforceable against the debtor, and unenforceable against property of the debtor, under any agreement or applicable law *for a reason other than because such claim is contingent or unmatured*;
(2) such claim is for unmatured interest....
11 U.S.C. § 502 (emphasis added)

section 362(a)(6), which stays "any act to collect, assess, or recover a claim against the debtor that arose before the filing of the Chapter 11 petition." 11 U.S.C. 362(a)(6).

■ Construing these Code provisions together allows a creditor to file a claim for the full amount of an unmatured debt owed by the debtor, despite the fact that the creditor is prevented, under Section 362 of the Code, from taking any steps to enforce that claim. In fact, actions taken to pursue prepetition claims during the pendency of a Chapter 11 proceeding are deemed void, *Springfield Bank v. Caserta*, 10 B.R. 57 (Bankr.S.D.Ohio 1981), including the sending of notices of default or of acceleration. *See, e.g., Southside Leasing Co. v. Merchant's Plaza, Inc. (In re Merchant's Plaza)* 35 B.R. 888, 893–94 (Bankr.D.Tenn. 1983) (postpetition notices of cancellation and termination of lease, designed to obtain possession, violate the stay); *In re Capital Mortgage & Loan*, 35 B.R. 967, 971 (Bankr. E.D.Cal.1983) ("The automatic stay prohibits the initiation of any steps, such as recording a notice of default, that would lead to foreclosure of property of the debtor's estate.")

■ Therefore, in the case at bar it was unnecessary, and indeed would have violated the stay, for the long-term lenders to take overt steps to accelerate the debt without first seeking a modification of the stay from this Court. The debt was automatically accelerated upon the filing of the petition by virtue of sections 101(4)(a) and 502 of the Code. Nevertheless, MFPC is entitled to deaccelerate this debt under the provisions of Code Section 1124(2).[5]

### B. Deacceleration of a Debt under Code Section 1124

■ Neither MFPC nor its creditors question the ability of a debtor to deaccelerate a contract and reinstate its original maturity date pursuant to Section 1124(2) of the Code. *In re Taddeo*, 685 F.2d 24 (2d Cir.1982); *Levy v. Forest Hills Associates (In re Forest Hill Associates)*, 11 B.C.D. 1145, 40 B.R. 410 (Bankr.S.D.N.Y.1984); *Hewitt v. Ketchikan Lodge No. 1429 (In re Hewitt)*, 16 B.R. 973 (Bankr.D.Ala.1982); 5 *Collier on Bankruptcy* ¶ 1124.03[2] at 1124–14. However, the long-term lenders assert that in order to leave a creditor unimpaired, as that term is defined in Section 1124(2)(C) of the Code, a debtor must pay interest on the entire accelerated debt from the time of default until the time of payment under a reorganization plan. Failure to do so, contend the long-term lenders, leaves a creditor impaired which, in turn, compels a "cram-down" situation under Code section 1129(b). This construction of section 1124 is not in accord with the holding of the Second Circuit Court of Appeals in *In re Taddeo*, 685 F.2d 24 (2d Cir.1982). The court in *Taddeo* stated that:

> Curing a default commonly means taking care of the triggering event and returning to pre-default conditions. The consequences are thus nullified. This is the concept of "cure" used throughout the Bankruptcy Code. Under § 365(b), the trustee may assume executory contracts and unexpired leases only if he cures defaults—but the cure need address only the individual event of default, thereby repealing the contractual consequences.

*Id.* at 26–27. Thus, Section 1124 allows the debtor to return the accelerated claim to its original maturity date and recreate the pre-

---

5. While the Court today holds that sending a notice of acceleration is unnecessary to file a claim against a debtor for the entire amount of the debt, despite the actual maturity date or the terms of the contract, this does not apply where notice is required as a condition precedent to establish other substantive contractual rights such as the right to receive a post-default interest rate. In that case, the sending of such notice would be ineffective under the automatic stay

provisions of the Code if done without the permission of the bankruptcy court. Therefore, the condition precedent would remain unsatisfied as a matter of law because the creditor would be unable to enforce the provision. However, because MFPC has agreed to pay the post-default interest rate and indeed has already made such payments, this issue is not before the Court at this time.

default setting for all purposes under the contract. As this Court has recently held:

> [T]he language which the Second Circuit employed in *Taddeo* clearly establishes that a cure of a default and reinstatement of a mortgage is deemed to return the parties to their status at a point in time prior to the default and acceleration. It follows logically that if there has been no default and acceleration, there can be no liability for interest on the accelerated debt.

*In re Forest Hills Associates*, 11 B.C.D. at 1147, 40 B.R. 410. *See also, Midland Mutual Life Ins. Co. v. Masnorth Co. (In re Masnorth)*, 36 B.R. 335 (Bankr.N.D.Ga. 1984); *Midland Mutual Life Ins. Co. v. Masnorth Co. (In re Masnorth)*, 28 B.R. 892 (Bankr.N.D.Ga.1983). *In re Orlando Tennis World Development Co., Inc.*, 34 B.R. 558 (Bankr.M.D.Fla.1983). See also § 1123(a)(5)(G) for power to cure defaults.

Furthermore, the argument of the long-term lenders, when taken to its logical conclusion, would result in double remuneration for a creditor in the event of deacceleration and reinstatement under 1124(2), for he could receive two awards of interest on the identical debt—one payment of interest on the accelerated amount at the time of confirmation, and the second payment of interest under the original terms of the contract as deaccelerated.

Therefore, this Court concludes that the long-term lenders are not entitled to receive interest on the accelerated portion of the debt despite the fact that the debt was indeed accelerated by virtue of the filing of the bankruptcy petition. The long-term lenders are merely entitled to interest on the overdue installments of principal. Nevertheless, the long-term lenders are unimpaired because they are returned to the same position they were in immediately prior to the acceleration, and are thereby given the full benefit of their original bargain, including the right to collect interest under the original terms of the contracts and the right to reaccelerate the debts if MFPC again defaults under the terms of the agreements. *See In re Forest Hills*

*Associates*, 11 B.C.D. at 1147–1148, 40 B.R. 410.

## II. Interest on Overdue Interest Payments

The second issue which the parties have asked this Court to resolve is whether MFPC must pay interest on the installments of interest which have remained unpaid since MFPC filed its bankruptcy petition on August 26, 1982.

■ The Supreme Court has stated that "it is manifest that the touchstone of each decision on allowance of interest in bankruptcy, receivership and reorganization has been a balance of equities between creditor and creditor or between creditors and the debtor." *Vanston Bondholders Protective Committee v. Green*, 329 U.S. 156, 165, 67 S.Ct. 237, 241, 91 L.Ed. 162 (1946). The obligation to pay post-petition interest, that is, any interest that accrues after a debtor has filed a petition in bankruptcy, is likewise founded on equitable principles.

### A. The Cognizability of Post-Petition Simple Interest Claims

In general, claims for post-petition interest can be divided into two categories: claims which are secured, and unsecured claims. Since the classes which make up this reorganization plan are made up of both secured and unsecured creditors, these two types of claims will be dealt with separately.

■ The general rule regarding the payment of post-petition interest on unsecured claims is that where the debtor is insolvent, the accrual of interest on unsecured claims against the debtor is suspended as of the date of the filing of the bankruptcy petition. *Vanston Bondholders Protective Committee v. Green*, 329 U.S. at 163, 67 S.Ct. at 240; *Sexton v. Dreyfus*, 219 U.S. 339, 344, 31 S.Ct. 256, 257, 55 L.Ed. 244 (1911); *Debentureholders Protective Committee of Continental Investment Corporation*, 679 F.2d 264, 268 (1st Cir.), *cert. denied*, 459 U.S. 894, 103 S.Ct. 192, 74 L.Ed.2d 155 (1982) (hereinafter *"CIC"*)

However, where the debtor's estate is sufficient to pay the interest which accrues after the filing date, "it would seem inappropriate to return to the debtor a surplus of his assets after accommodation of all claims without a distribution to the creditors of accrued interest to the date of payment of the claims by the trustee." 3 *Collier on Bankruptcy* ¶ 502.02 at 502–33. Therefore, where the debtor is solvent, the bankruptcy rule is that post-petition interest which accrues on unsecured claims which are allowable against the debtor's estate will be paid in full before any money is allowed to revert back to the debtor or its shareholders. *See CIC,* 679 F.2d at 271. *See also Case v. Los Angeles Lumber Products Co.,* 308 U.S. 106, 60 S.Ct. 1, 84 L.Ed. 110 (1939); *Northern Pacific Ry. v. Boyd,* 228 U.S. 482, 33 S.Ct. 554, 57 L.Ed. 931 (1913).

■ In the case of secured claims against a debtor, Section 506(b) of the Code codifies the long-standing rule that where "an allowed secured claim is secured by property the value of which ... is greater than the amount of such claim, there shall be allowed to the holder of such claim, interest on such claim...." 11 U.S.C. 506(b). Unlike the rule for unsecured claims, the rule regarding secured claims makes no distinction between solvent and insolvent debtors, but it is nevertheless based on considerations of fairness to the affected creditors. Thus, the United States Supreme Court in *Vanston* further declared:

> To allow a secured creditor interest where his security was worth less than the value of his debt was thought inequitable to unsecured creditors.... But where an estate was ample to pay all creditors and to pay interest even after the petition was filed, equitable considerations were invoked to permit payment of this additional interest to the secured creditor rather than to the debtor.

*Vanston Bondholders Protective Committee v. Green,* 329 U.S. at 164, 67 S.Ct. at 240 (citations omitted).

■ In the case at hand, MFPC is a concededly solvent corporation with sufficient assets to pay all its creditors, plus interest. *See In re Manville Forest Products,* 31 B.R. 991, 994 (S.D.N.Y.1983); *Objection of MFPC to Applications For Final Compensation* at 2, No. 82 B 11659, (Bankr.S.D.N.Y. filed Aug. 3, 1984); *Disclosure Statement for MFPC* at 2, No. 82 B 11659, (Bankr.S.D.N.Y. filed January 16, 1984). In addition, neither MFPC nor its secured lenders dispute that the value of the secured claims is less than the value of the collateral securing those claims. Thus, MFPC is obligated to pay post-petition interest to these long-term lenders on both its secured and unsecured obligations, to the extent that those obligations were unpaid during the pendency of the bankruptcy proceedings.

B. *The Cognizability of Interest on Post-Petition Interest Payments*

■ Unlike the situation with post-petition interest due on the principal, MFPC is not required to pay interest on the unpaid installments of interest on these obligations, despite the contentions of the long-term lenders. The bankruptcy rule regarding interest on interest, or compounded interest, is that "where there is a *contractual* provision, valid under state law, providing for interest on unpaid instal[l]ments of interest, the bankruptcy court will enforce the contractual provision with respect to both instal[l]ments due before and instal[l]ments due after the petition was filed. *Ruskin v. Griffiths,* 269 F.2d 827, 830–32 (2d Cir.1959), *cert. denied,* 361 U.S. 947 [80 S.Ct. 402, 4 L.Ed.2d 381]...." *CIC,* 679 F.2d at 269 (emphasis in original).

Here, the contracts in question are governed by the laws of the States of New York, Louisiana, and New Jersey. The laws of each of these States invalidate agreements to pay interest on overdue interest, for public policy reasons.[6] There-

---

**6.** While post-default independent agreements may effectively create an enforceable obligation to pay interest on interest, such a provision in

fore, although this Court today holds that MFPC must pay interest on its post-petition arrearages, the Court will not award the long-term creditors compounded interest in violation of the laws of these states, regardless of the intent of the parties at the time they entered into the contracts. Rather, the long-term lenders are limited to simple interest on the unpaid installments of principal which became due after the filing of the bankruptcy petition.

### III. *Lost Opportunity Costs and the Appropriate Interest Rate Under the Code*

■ The long-term lenders next contend that the appropriate rate of interest to be applied to their claims should be the higher of the contract rate or the market rate of interest. They take the position that they should be compensated under Section 1124(2)(C) of the Code for the lost opportunity costs of the defaulted payments. Section 1124(2)(C) provides that a holder of a claim which is deaccelerated pursuant to section 1124(2) should be compensated "for any damages incurred as a result of any reasonable reliance by such holder on such contractual provision or such applicable law...." The long-term lenders argue that lost opportunity cost represents compensation for the loss of the use of installment payments which, but for MFPC's defaults, would have been paid to the lenders and reinvested by them at current interest rates. However, this Court finds that this 'loss' is not the type of compensatory damages contemplated by § 1124(2)(C). The compensation which Section 1124(2)(C) considers clearly must arise out of *reasonable reliance* by a creditor on a contractual provision or other related law. The long-term lenders have not shown that the subject loan agreements provide for interest at the market rate, but merely decry the fact that the rate of interest they bargained for is inadequate in today's market. Such complaints are not persuasive for, as the Court noted in *In re Pine Lake Village Apartment Co.*, 19 B.R. 819 (Bankr.S.D.N.Y.1982) in the context of adequate protection for secured long-term lenders,

A mortgage transaction is a voluntary undertaking; the lender participates with the understanding that the mortgage

the original agreement will not be enforced in any of the states involved.

"For a century the New York Court of Appeals consistently has held that a contractual provision to pay interest on interest is void under the law of New York". *CIC,* 679 F.2d at 271. *See also Madison Personal Loan, Inc. v. Parker,* 124 F.2d 143, 145 (2d Cir.1941); *Newburger-Morris Co. v. Talcott,* 219 N.Y. 505, 510, 114 N.E. 846, 847 (1916); *Young v. Hill,* 67 N.Y. 162, 167–69 (1876); *Stewart v. Petree,* 55 N.Y. 621, 623 (1874); *Giventer v. Arnow,* 44 A.D.2d 160, 161, 354 N.Y.S.2d 162, 164 (3d Dept.1974), *rev'd on other grounds,* 37 N.Y.2d 305, 372 N.Y.S.2d 63, 333 N.E.2d 366 (1975).

In New Jersey, compounding of interest after default, in the absence of a separate agreement explicitly providing for interest on interest, has likewise been disallowed for over a century. *Force v. City of Elizabeth,* 28 N.J.Eq. 403, 405 (Chancery 1877) (compound interest disallowed), *rev'd on other grounds,* 29 N.J.Eq. 587 (Errors and Appeals 1878).

> [C]ompound interest is not ... recoverable unless there has been a settlement between the parties of a conclusive character, or a judgment whereby the aggregate amount of principal and interest is converted to a new principal debt, or where the exaction of compound interest is in some valid form confirmed by a special agreement.

*Abramowitz v. Washington Cemetery Ass'n,* 139 N.J.Eq. 293, 296–97, 51 A.2d 461, 463 (Chancery 1947) *quoted in Shadow Lawn Savings & Loan Ass'n v. Palmarozza,* 190 N.J.Super. 314, 317, 463 A.2d 384, 386 (1983).

In Louisiana, "no stipulation in the original contract authorizing recovery of interest on interest is valid." La.Civ. Code Ann. Art. 1939 (West Supp.1984). "Interest upon interest cannot be recovered unless it be added to the principal, and by another contract made a new debt...." *Id.* These provisions of Article 1939, introduced into Louisiana's Civil Code by amendment in 1870, *see* 7 West's Louisiana Statutes Annotated: Civil Code at 596 (1977), reflect that State's consistent policy against granting interest on interest in the absence of an agreement to incorporate accrued interest into the principal debt. *See, e.g., Nerault v. Dodd,* 3 La. 430, 431 (1832); *Hyde v. Brown,* 5 La. 33, 34 (1832) (both indicating that judgments in favor of payees of notes do not oblige payors to pay interest on accumulated interest); *Odom v. Hulse,* 170 So.2d 147, 148 (La.App.1964) (no obligation to pay interest on interest will be inferred), *writ refused,* 247 La. 415, 171 So.2d 668 (1965).

contract creates a relationship that extends over a number of years. Hindsight gained during a particular business cycle that is producing high interest rates undoubtedly causes a mortgagee to reflect on the profound lack of wisdom accompanying his decision to enter into the earlier venture. However, as long as the collateral value remains stable the debtor cannot be called upon to compensate the mortgagee for the delay he must endure before parlaying his foreclosure proceeds into a better investment. Adequate protection relates to preservation of collateral, and not to compensation for the loss of a better business opportunity. As long as the collateral value is constant, the mortgagee will receive the benefit of his bargain.

*Id.* at 827. *See also In re Rainbow Forest Apartments,* 33 B.R. 576 (Bankr.N.D.Ga. 1983); *In re Masnorth Corp.,* 28 B.R. 892 (Bankr.N.D.Ga.1983); *In re South Village, Inc.,* 25 B.R. 987 (Bankr.D.Utah 1982). This pronouncement is equally applicable in the context of compensation to creditors under section 1124(2)(C).

The court in *In re Rolling Green Country Club,* 26 B.R. 729 (Bankr.D.Minn.1982) similarly rejected this argument for lost opportunity costs, declaring:

> The purpose of [section 1124] is to permit ... debtor to retain the security and enjoy the benefits of the original security arrangements. In that the purpose is to protect against the rights lost simply by reason of acceleration. It would seem fruitless indeed if the debtor is required in order to enjoy the benefit of this section to pay the total expected present economic cost of retaining or restoring the maturities provided in the instrument.

*Id.* at 733.

Thus lost opportunity costs are not compensable under Code Section 1124(2)(C). The only compensation available to creditors of a debtor who reinstates a defaulted contract under this section is reimbursement for those damages which result from reliance on an existing contractual provision or applicable law. The Bankruptcy Court will not redraft a contract to make its provisions more palatable to the creditor, for to do so would clearly frustrate basic policies behind the Bankruptcy Code. Nor will the Court attribute such an intent to the drafters of the Code who recognized that "[t]he intervention of bankruptcy and the defaults represent a temporary crisis which the plan of reorganization is intended to clear away. The holder of a claim or

---

**7.** The Ninth Circuit Court of Appeals in a setting totally dissimilar to this case has recently rejected this view. *In re American Mariner Industries, Inc.,* 734 F.2d 426, 431 (9th Cir.1984). That court, in dealing with the discomfiture of an *undersecured* creditor forced to endure the automatic stay of Section 362, embraced the concept of lost opportunity cost of money. In so doing, the court stated that such cases as *In re Pine Village Apartment Co.* and *In re South Village, Inc.* "accord insufficient weight to the language of the statute and the constitutional goal of *affording the secured creditor the benefit of its bargain".* *Id.* at p. 434 (emphasis added).
This Court feels that the standard of adequate compensation enunciated by the Ninth Circuit for secured creditor protection under Code Section 362 is clearly inapplicable in the context of deacceleration under Section 1124, because in the latter situation the secured creditor is indeed receiving the benefit of his original bargain and is in fact no worse off than he would have been in the absence of a bankruptcy filing. Furthermore, this early triage stage remedy is inappropriate and of dubious universal applica-

tion. It is not unforseeable, under the Ninth Circuit's analysis, that a debtor may be required to compensate a creditor for his lost opportunity under Section 362 at the market rate of interest, then later opt to reinstate the contract at its original interest rate under Section 1124(2). In that event, if, as is often the case, the market rate is higher than the contract rate, the debtor would be in the awkward position of having to demand a refund of interest from the secured creditor upon confirmation of a plan. As the court stated in *In re South Village,* 25 B.R. 987, 998 (Bankr.D.Utah 1982) "aside from the administrative inconvenience of such a course, the need to invent a procedure for refunds is proof that Congress never contemplated opportunity cost as adequate protection in light of Section 1124(2)." Id. at 998. Significantly even if the expansive holding of *American Mariner* were applicable here, the long-term lenders' request for a market rate of interest would be unavailing as that court might well compute the lenders lost opportunity cost at the *lower* of market rate of interest or contract rate.

interest who under the plan is restored to his original position, when others receive less or get nothing at all, is fortunate indeed and has no cause to complain." S.Rep. No. 989, 95th Cog., 2d Sess. 120 *reprinted in* 1978 U.S.Code Cong. & Ad. News 5787, 5906.

 Accordingly, the Court finds that the contract rate, and not the market rate, is the correct rate of interest to be paid by MFPC on the arrearages which MFPC owes to the long-term lenders. Any other holding would contravene the purpose underlying Section 1124(2)(C) of the Code and the Second Circuit's opinion in *Taddeo*.

### Conclusion

Pursuant to Code Section 502 the principal amounts due on all claims against the debtor are accelerated by virtue of the filing of a bankruptcy petition. This acceleration obviates the need of a creditor to take any formal steps to accelerate a debt in accordance with the terms of a contract with the debtor, which, in the absence of authorization by the Court, would violate the automatic stay provisions of Code Section 362.

Nevertheless, Code Section 1124(2) allows a debtor to deaccelerate a debt in its plan of reorganization by curing all defaults, reinstating the original maturity date of the indebtedness, and compensating the creditor for any damages incurred as a result of the creditor's reasonable reliance on the accelerated contract or applicable law. Compensation, as used in this section, includes interest payments on all past due principal amounts under the defaulted contracts. However, compensation is not to be interpreted to include interest on the entire amount of the accelerated portion of the debt, for to do so would contravene the intended purpose of this section, which is to return the parties to their status prior to the default and reinstate the original terms of the loan. To allow interest on the accelerated amount of the debt would unjustly enrich the creditor, for not only would he be given the benefit of his original bargain, and original interest rates, but he would

also be receiving a bonus payment of interest on a temporarily ballooned debt. Nor, absent a contractual clause providing interest at the market rate of interest, does compensation include interest at the rate prevailing at the time of the cure and reinstatement, for the Code is clear in its mandate that a creditor be compensated only for its *reasonable reliance* on an *existing* contractual provision or applicable law.

Moreover, compounded interest on the unpaid installments will be awarded only where the contract in question contains a provision calling for compounded interest, which is valid under the law of the state which governs the contract. If, however, the contractual clause providing for payments of interest on interest would be held invalid on public policy grounds by the laws of the state which controls the contract, the Bankruptcy Court is constrained to likewise hold such compounding invalid, and limit the creditor to simple interest on his claim. *See Madison Personal Loan Inc. v. Parker*, 124 F.2d 143, 145 (2d Cir.1941); *In re Forest Hills Associates*, 11 B.C.D. at 1148, 40 B.R. 410; *Young v. Hill*, 67 N.Y. 162, 167 (1876).

Accordingly, in the case at bar, this Court finds that the debts owed by MFPC to the long-term lenders were accelerated by reason of the filing of the bankruptcy petition, despite the fact that the long-term lenders failed to notify MFPC of their intent to accelerate as required under the terms of the Loan Agreements. Nonetheless Code Section 1124(2) permits MFPC, in its reorganization plan, to cure all defaults and reinstate the maturity dates of the various loan agreements. Curing the defaults under section 1124(2)(A) involves a) the payment by MFPC of all unpaid installments of principal under the loan agreements from August 26, 1982 until April 5, 1984, the date MFPC resumed paying its obligations to the long term lenders; and b) the payment of simple interest on those arrearages, to be calculated at the contract rates stipulated by the parties.

Submit an appropriate order.